473 A.2d 469

**COMPTROLLER OF THE TREASURY**

v.

**RAMSAY, SCARLETT & CO., INC.**

**No. 706, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

April 6, 1984.

332

Gerald Langbaum, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen. of Md. and John K. Barry, Asst. Atty. Gen., on brief, for appellant.

Neil S. Kurlander, Baltimore, for appellee.

Argued before LOWE, LISS and ADKINS, JJ.

ADKINS, Judge.

For income tax purposes, Article 81, § 316(c), Annotated Code of Maryland, provides for allocation of business income of a corporation which conducts business "partly within and partly without this State."

[S]o much of the business income of the corporation as is derived from or reasonably attributable to the . . . business of the corporation carried on within this State, shall be allocated to this State and any balance of the business income shall be allocated outside this State. The portion of the business income derived from or reasonably attributable to the . . . business carried on within this State may be determined by separate accounting where practicable, *but never in the case of a unitary business;* . . . where separate accounting is [not] allowable . . . the portion of the business income of the corporation allowable to this State shall be determined in accordance with a three-factor formula. . . . [Emphasis supplied].

During the income tax years 1974–1977 inclusive, appellee Ramsay, Scarlett & Company, Inc., headquartered in Baltimore, conducted operations in Virginia and Louisiana in addition to those it maintained in Maryland. It excluded

from its Maryland returns income from the Louisiana activities. The Comptroller, being of the view that all of Ramsay Scarlett's enterprises constituted a unitary business, disallowed this separate accounting and assessed Ramsay Scarlett pursuant to the three-factor formula. This produced an aggregate increase of taxes in the amount of $31,840, exclusive of interest. Ramsay Scarlett appealed to the Maryland Tax Court, which reversed, concluding that the Louisiana enterprise was not part of a unitary business. The Circuit Court for Baltimore City affirmed.

The Comptroller has now brought the matter here. Both parties agree that the question presented is:

Did Ramsay Scarlett conduct a unitary business in Maryland, Virginia [1] and Louisiana, thereby precluding it from using separate accounting with respect to its Louisiana operations in arriving at the amount of its income taxable in Maryland?

In addition, we must consider the appropriate scope of review of a decision of the Tax Court. We place the legal issues in context by summarizing the pertinent facts.

*Facts*

From the record we learn that Ramsay Scarlett is a Maryland corporation with its principal place of business in Baltimore. Established in 1926, it is and during the tax years in question was engaged in steamship agency and stevedoring operations in that city. In about 1958 it entered the Louisiana market with a bulk terminal business. Later it extended its activities to Virginia, where both agency and stevedoring operations are conducted.[1]

The Louisiana business has always been an unincorporated division of Ramsay Scarlett. During the period pertinent to this case, the Louisiana activities consisted chiefly of warehousing (export bagging), an enterprise which, like the Loui-

---

1. Ramsay Scarlett concedes that its Virginia and Maryland operations are part of a unitary business. Only the Louisiana activities are at issue in this case.

siana bulk storage of liquid chemicals, was not conducted in Baltimore. Lesser portions of the Louisiana operation consisted of barge loading and unloading, stevedoring, and steamship agency work.

Day-to-day management of the Louisiana division was handled by a manager who reported directly to Ernest Levering, the corporation's president, in Baltimore. The manager's salary was set by the board of directors in Baltimore. The manager could be fired by board action. Functions such as purchasing of supplies, banking, borrowing, solicitation and choice of customers, fees charged, credit terms, billing, and selection of accounting and legal assistance were all handled locally in Louisiana, as was hiring and firing of local personnel, who were paid local wages.

Nevertheless, the board of directors had authority to make major policy decisions affecting Louisiana. For example, the board had to approve purchases of major equipment, such as cranes, and purchase of a warehouse in Louisiana was made only after board approval. This home-office supervision was only lightly exercised, however. President Levering visited Louisiana only two or three times a year. Visits to Baltimore by the Louisiana manager were even less frequent. Written communications between Levering and Richard Daniels, the Louisiana manager, were but occasional, as were telephone conversations. Levering could not recall any occasion on which he had disapproved a proposal made by Daniels, and the president characterized his supervision of the Louisiana branch as "supervision in name only. . . ." Primarily, he "just want[ed] to be kept advised of what occur[red]."

Baltimore did handle some functions on a corporation-wide basis. Payroll for all administrative personnel, including Louisiana, was centrally processed. A single profit-sharing plan for all employees was administered in Baltimore. This was also true as to a health insurance plan. Additionally, because of cost savings, there was a central provision of workmen's compensation and general liability insurance.

The Louisiana operation did not rely on or obtain financial support from Baltimore. But by action of the Baltimore management, surplus Louisiana earnings were remitted to Baltimore and used to pay Baltimore bills as part of the "general [*sic*] corporate situation" or invested. The income produced by investment of Louisiana funds also went "to the general operating revenue of Baltimore."

From this record the Tax Court found:

> The Comptroller has identified some tangible connections between Ramsay Scarlett's Baltimore and Louisiana operations. However, the connections are incidental and most probably arise as a matter of convenience. There is no indication that either the Baltimore or the Louisiana branch depends on these connections; nor do they establish central management or control. On the contrary, the evidence tends to indicate that through separate day to day management; purchasing, sales, accounting, advertising and financing, each of these branches operates independently.
>
>     \*     \*     \*     \*     \*     \*
>
> ... In form, the Board of Directors did assume the normal corporate management power but the Comptroller has failed to indicate any instances where such power was actually exercised. Instead, the record indicates that the Board of Directors allowed the Louisiana branch to operate of its own force.

It concluded that "Ramsay Scarlett has shown that its Louisiana operation branch operates independently from its Maryland operation; [*i.e.* that there was not a unitary business] and the Comptroller has failed to establish that activities in Maryland have any substantive bearing on the Louisiana operation." As we have noted, the Circuit Court for Baltimore City affirmed, stating that "[t]he record contains substantial evidence to support the Tax Court's determination" and that "this Court perceives no error of law."

Before we address the Comptroller's contention that this holding was reversibly erroneous, we must consider the scope of judicial review of the Tax Court's decision.

## Scope of Review

Article 81, § 229(*o*) of the Code provides that a decision of the Tax Court shall be affirmed "if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record...." In *Comptroller of the Treasury v. Diebold, Inc.,* 279 Md. 401, 407, 369 A.2d 77 (1977) (also a unitary business case) the Court of Appeals construed this statute [2] and said:

> judicial review of decisions of the Maryland Tax Court is severely limited.... We have held that the standard by which a result reached by the Tax Court is reviewed is whether a reasoning mind reasonably could have reached the factual conclusion which that agency reached, *Fairchild Hiller Corp. v. Supervisor of Assessments,* 267 Md. 519, 521, 298 A.2d 148, 149 (1973). The application of this test need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment.

That this limitation of judicial review is addressed to findings of fact made by the administrative agency is clear both from the language quoted and from the Court's citation of *Fairchild Hiller,* which involved precisely that point. The standard of judicial review as to factual determinations is like the "fairly debatable" rule frequently used in zoning cases and this, in turn, "is analogous to the 'clearly erroneous' standard commonly applied under Md.Rules 886 and 1086." *Sedney v. Lloyd,* 44 Md.App. 633, 637 n. 6, 410 A.2d 616 (1980). *See also Comptroller of the Treasury v. Haskins, Valette, and Heacock,* 298 Md. 681, 472 A.2d 70 (1984) and *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834 (1975) (an on-the-record review of District Court decision, circuit court

---

2. Then designated as § 229(*l*).

is bound by findings of fact unless clearly erroneous). *Compare Board of Education v. Waeldner,* 298 Md. 354, 361, 470 A.2d 332 (1984).

As to matters of law, it is clear that when courts deal with such issues as interpretation of statutes and legislative intent, they feel free to substitute their judgments for that of the agency. *Supervisor of Assessments v. Carroll,* 298 Md. 311, 469 A.2d 858 (1984); *Supervisor of Assessments v. Sloan,* 57 Md.App. 286, 469 A.2d 915 (1984); *Maryland National Bank v. State Dept. of Assessments and Taxation,* 57 Md.App. 269, 469 A.2d 907 (1984); *State Dept. of Assessments and Taxation v. Glick,* 47 Md.App. 150, 153, 422 A.2d 34 (1980); *Supervisor of Assessments v. Washington Natl. Arena Limited Partnership,* 42 Md.App. 695, 402 A.2d 148 (1979).

It is not always easy, however, to determine what is a question of law and what is a question of fact; *see Palmer Ford, Inc. v. Wood,* 298 Md. 484, 471 A.2d 297 (1984). How do we deal with ultimate facts, inferences, or conclusions? It appears that when agency conclusions are based on facts supported by substantial evidence and when the conclusions themselves are not contrary to law (*e.g.* in conflict with a statute) a court ordinarily does not substitute its judgment for that of the agency. *Jacocks v. Montgomery County,* 58 Md.App. 95, 472 A.2d 485 (1984); *Maryland-National Capital Park and Planning Commission v. Friendship Heights,* 57 Md.App. 69, 468 A.2d 1353 (1984). This approach stresses the relationship between properly substantiated facts and the conclusions based on them. Nevertheless, "[w]here [as is essentially the case here] the factual context of a particular controversy is undisputed, the reviewing court is free to substitute its own judgment on questions of law." *Comptroller v. Chesapeake Corp. of Virginia,* 54 Md.App. 208, 212, n. 4, 458 A.2d 459 (1983); *see also Chase Brass and Copper Co., Inc. v. Franchise Tax Board,* 10 Cal.App.3d 496, 95 Cal.Rptr. 805 (1970).

Yet other questions arise when mixed questions of fact and law are presented. Some courts have held that in these circumstances "the full scope of [appellate] review [is] appropriate. . . ." *See, e.g., Becton, Dickinson and Company v. Dept. of Revenue,* 383 Mass. 786, 422 N.E.2d 1350 (1981).

It appears that the scope of review in Maryland when agency conclusions or ultimate judgments are involved, is not entirely clear, at least when statutory construction is not involved. This problem was recently discussed by the Supreme Court of Alaska and resolved in a fashion we think not inconsistent with Maryland decisions. *Earth Resources Co. of Alaska v. Dept. of Revenue,* 665 P.2d 960 (Alaska 1983) was a case in which the court held a business to be unitary. As is the case here, the facts were essentially undisputed, although the conclusions to be drawn from them were. Chief Justice Burke, writing for the court, concluded that the issue of whether the taxpayer was conducting a unitary business was a question of law: "Whether the appropriate rule of law has been applied to a given set of facts is a question which requires a standard of review different than the substantial evidence test, which is used in the review of questions of fact." 665 P.2d at 964. He continued:

> . . . . This court has distinguished between the rational basis standard for questions of law involving agency expertise and the substitution of judgment standard for questions of law where no expertise is involved. The rational basis test may be applied in two circumstances. First, it is applied where the agency is making law by creating standards to be used in evaluating the case before it and future cases. Second, it is applied when a case requires resolution of policy questions which lie within the agency's area of expertise and are inseparable from the facts underlying the agency's decision.[3] The rational

---

**3.** This is a good description of the circumstances that existed in *Maryland-National Capital Park Planning Commission v. Friendship*

basis test requires a reviewing court to consider factors of agency expertise, policy, and efficiency when reviewing discretionary decisions. Thus, it is a more deferential standard than the substitution of judgment standard; the court merely seeks to determine whether the administrative agency's decision is supported by the facts and has a reasonable basis in law.

The substitution of judgment standard is applied where the questions of law presented do not involve agency expertise and thus, a court need not take the deferential stance embodied in the rational basis test. The standard is appropriate where the knowledge and experience of the agency is of little guidance to the court or where the case concerns "statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge and experience" [quoting *Kelly v. Zamarella,* 486 P.2d 906, 916 (Alaska 1971)]. Application of this standard permits a reviewing court to substitute its own judgment for that of the agency's, even if the agency's decision had a reasonable basis in law. [citations and footnote omitted].

*Id.* at 964–65.

In the case *sub judice,* we do not have before us a situation in which the Tax Court was making standards to apply in the case before it, nor was that agency either resolving policy questions within its area of expertise or applying its expertise to some arcane corner of tax law. Instead, it was applying judicially-developed standards to facts that involved common business operations and practices in order to reach a legal conclusion. Under these circumstances, we think it appropriate to apply (and the circuit court should have applied) the "substitution of judgment" standard of review to the question of whether Ramsay Scarlett's Louisiana operation was part of a unitary business. *Compare Container Corp. of America v. Franchise*

---

*Heights, supra,* and in which we in effect applied the "rational basis" test.

*Tax Board,* —— U.S. ——, 103 S.Ct. 2933, 2946, 77 L.Ed.2d 545 (1983): "[O]ur task must be to determine whether the state court applied the correct standards to the case; and if it did, whether its judgment 'was within the realm of permissible judgment.'" [footnote omitted]. *See also Wisconsin Dept. of Revenue v. Exxon Corp.,* 90 Wis.2d 700, 281 N.W.2d 94, 102 (1979), *aff'd sub nom. Exxon Corp. v. Dept. of Revenue,* 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980) (question of whether Exxon operated a unitary business is a question of law). We now proceed to address the unitary business issue.

### *Unitary Business*

The Due Process and Commerce clauses of the United States Constitution do not permit a state to tax income arising out of interstate activities unless there is a minimal contact or nexus between the interstate activities and the taxing state and a rational relationship between the income attributed to the taxing state and the interstate values of the enterprise. *Container Corp. of America v. Franchise Tax Board, supra,* 103 S.Ct. at 2940. The requisite minimal contact or nexus is present if the in-state and out-of-state activities are part of a unitary business. "[T]he linchpin of apportionability in the field of state income taxation is the unitary business principle." *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 439, 100 S.Ct. 1223, 1232, 63 L.Ed.2d 510 (1980). If a corporation is a unitary business, the taxing state may apply an apportionment formula to its total business income to obtain a "rough approximation" of the corporate income that is "reasonably related to the activities conducted within the taxing state." *Exxon Corp. v. Dept. of Revenue,* 447 U.S. 207, 223, 100 S.Ct. 2109, 2120, 65 L.Ed.2d 66 (1980). That is the theory underlying that portion of Article 81, § 316(c) of the Code which requires the business income of a unitary business "allowable to this State [to be] determined in accordance with a three-factor formula. . . ." *See* F. Keesling, "A Current Look at the Combined Report and Uniformity in Allocating Practices," 42 J.Tax 106, 107 (Feb.1975).

The Supreme Court of the United States and other courts have established tests to determine whether a business is unitary. Applying the teachings of *Mobil Oil Corp.* and *Exxon Corp.,* both *supra,* the Court of Appeals in *Xerox Corp. v. Comptroller,* 290 Md. 126, 139, 428 A.2d 1208 (1981) stated these tests. Wrote Chief Judge Murphy:

... In *Butler Bros. v. McColgan,* 17 Cal.2d 664, 678, 111 P.2d 334, 341 (1941), *aff'd.* 315 U.S. 501, 62 S.Ct. 701 [86 L.Ed. 991], ... (1942), the Supreme Court of California focused on the presence of the following circumstances: "(1) unity of ownership; (2) unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) unity of use in its centralized executive force and general system of operation." Another commonly cited definition is whether one business enterprise is dependent upon or contributory to another.... In *Great Lakes Pipe Line Co. v. Commissioner of Taxation,* 272 Minn. 403, 138 N.W.2d 612 (1965), *appeal dismissed,* 384 U.S. 718, 86 S.Ct. 1886 [16 L.Ed.2d 881], ...

(1966), the Supreme Court of Minnesota stated that "[W]hether a number of business operations having common ownership constitute a single or unitary business or several separate businesses for tax purposes depends upon whether they are of mutual benefit to one another and on whether each operation is dependent on or contributory to others." *Id.* [272 Minn.] at 408, 138 N.W.2d at 616.

The unities test has sometimes been described as merely a more particular statement of the dependency test. *Chase Brass and Copper Co., Inc. v. Franchise Tax Board,* 86 Cal.Rptr. at 353.

The Tax Court, in the case before us, attempted to apply these tests, but for reasons we shall now explain, we do not think it did so properly.

*The Unities*

The first of these, unity of ownership was listed by the Tax Court as one element of the unities test, but not

mentioned again. Although this may not be the most important of the three factors (because to one extent or another it would appear to be present in every unitary business case) we point out that it was clearly and strongly present here. This was not a case concerning dividends or other income produced by a wholly or partly-owned subsidiary corporation of a parent corporation. *F.W. Woolworth Co. v. Taxation and Revenue Dept.*, 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982); *ASARCO, Inc. v. Idaho State Tax Comm.*, 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982); *Xerox Corp. v. Comptroller, supra.* There was but one corporate entity here: Ramsay Scarlett. The Louisiana operation was an unincorporated division of that corporation. Thus, there was full unity of ownership. While this factor alone may not be decisive, *Comptroller v. Diebold, supra*, it is a factor, nevertheless, and was weighed heavily in favor of unitariness in *Russell Stover Candies, Inc. v. Dept. of Revenue*, 665 P.2d 198 (Mont.1983), another case concerned with an unincorporated operational division of a corporation. The Tax Court should at least have considered this factor in making its ultimate determination.

■ The second unity is that of operation. This relates to what have been described as "staff" functions. *Chase Brass and Copper Co. v. Franchise Tax Board, supra*, 95 Cal.Rptr. at 808. Although Ramsay Scarlett's Louisiana division performed some of these functions autonomously, it is undisputed that others were performed centrally in Baltimore. The latter included payroll processing; administration of health and workmen's compensation, and general liability insurance coverage; and the corporate profit-sharing plan. The arrangements before us show fewer central services provided for the Louisiana division by Ramsay Scarlett than Russell Stover Candies provided its Montana ranch divisions in *Russell Stover Candies, supra* (unitary business found). But they are greater in the instant cases than those provided its foreign subsidiaries by Woolworth in *F.W. Woolworth Co., supra* (unitary business not found).

The Tax Court thought that these connections between Baltimore and Louisiana were merely "incidental and most probably arise as matters of convenience." But the fact that certain arrangements are convenient does not mean they do not tend to indicate unity of operation. It is clear that totally integrated operation is not required. The economies of scale produced by the cost saving of administrative activities such as the insurance and payroll functions Ramsay Scarlett handled indicate the presence of a substantial degree of operational unity, as does the importance of the corporate-wide profit-sharing plan, which otherwise might not have been a qualified plan under federal law. *Chase Brass and Copper, supra.* We conclude that the Tax Court misapprehended and therefore misapplied the concept of operational unity.

Unity of use is the third element of the unities test. This relates principally to control. The Tax Court's finding that day-to-day management of the Louisiana branch was "separate" from Baltimore was not clearly erroneous, although its finding that "The Comptroller has failed to indicate any instances where [normal corporate] power was actually exercised [over the Louisiana division]" was.[4] The record clearly shows that Ramsay Scarlett's board approved the acquisition of a warehouse site in Louisiana. This was certainly an exercise of normal corporate authority over the Louisiana division, as was Baltimore management's insistence that Louisiana excess profits be remitted to Baltimore, for use there. We shall return to financial arrangements shortly.

---

4. We note in passing that the Tax Court seems to have misallocated the burden of proof. The burden of proving facts to show the existence of a unitary business was not on the Comptroller. The burden of proving facts to show the contrary (*i.e.* separate and distinct business) was on Ramsay Scarlett. *Exxon Corp. v. Dept. of Revenue, supra,* 447 U.S. at 224, 100 S.Ct. at 2120. *See also Mobil Oil Corp. v. Commissioner of Taxes* and *Xerox Corp. v. Comptroller,* both *supra,* and *W.R. Grace Co. v. Commissioner of Revenue,* 378 Mass. 577, 393 N.E.2d 330 (1979).

It is true that the visitorial power was infrequently and apparently lightly executed. On the other hand, there is more here than the "occasional oversight" the Supreme Court thought an important indication of non-unitariness in *F.W. Woolworth, supra,* 102 S.Ct. at 3138. In both *Woolworth* and *ASARCO, supra,* the Supreme Court held certain foreign subsidiaries to be, in effect, only investments of the parent corporations. Here, the Ramsay Scarlett board retained control of major policy decisions, and had the power to fix the salary of and to fire the Louisiana manager as well. That President Levering did not remember ever overruling manager Daniels does not necessarily mean that control was not exercised; it may mean only that Daniels was a very capable manager. In any event:

Neither close functional integration nor actual exercise of operational control [is] essential to unitariness; as in the [*W.R.*] *Grace* [*& Co. v. Commissioner of Revenue, supra* ] case, the taxpayer publicly held itself out as having control and it had the potentiality for control [citations omitted].

*Becton, Dickinson and Company v. Dept. of Revenue, supra,* 422 N.E.2d at 1352. The record demonstrates that Ramsay Scarlett had more than "the potentiality for control" over its Louisiana division. And some public acknowledgment of this is found in the letterheads used in Louisiana. So far as the record extract reveals, some of these show only the name "Ramsay, Scarlett & Company, Inc." with a Louisiana address. Others show a local name, such as "Baton Rouge Terminal Company" but make clear that Baton Rouge is a "Division of Ramsay, Scarlett & Co., Inc." Only the letterhead of Southeastern Terminal Company (a stevedoring activity) appears to make no reference to Ramsay Scarlett.

In sum, we hold that application of the unities test to the record before us demonstrates that Ramsay Scarlett and its Louisiana division were part of a unitary business. At the very least it is clear that Ramsay Scarlett has failed to sustain its burden of proving the distinct and separate

nature of the Louisiana operation. *See Xerox Corp. v. Comptroller, supra,* and n. 4, *supra.* And the same result occurs if we apply the more general dependency test.

*Dependency*

██ It will be recalled that the latter test asks whether the business activities under review "are of mutual benefit to one another and . . . whether each operation is dependent on or contributory to others." Page 342, *supra.* The Tax Court found that neither the Baltimore nor the Louisiana branch was dependent on the other. It did not discuss the "mutual benefit" or "contributory" aspects of this test.

██ To meet the dependency test, it is not necessary to show that the "operations within and without the state are 'necessary and essential' to each other and to the functioning of the business as a whole." *Superior Oil Company v. Franchise Tax Board,* 60 Cal.2d 406, 34 Cal.Rptr. 545, 386 P.2d 33, 37 (Cal.1963). Nor need there be physical movement of tangibles between the two states. *Id.* *See also Container Corp. of America v. Franchise Tax Board, supra,* 103 S.Ct. at 2947. In the case before us, Louisiana depended upon Maryland for the performance of the central administrative functions we have earlier discussed. The performance of those functions in Maryland was of financial and operational benefit to both operations. But what is most important is that Louisiana made financial contributions to the Maryland operation and to the unitary business as an entity. As part of the exercise of Ramsay Scarlett's corporate control over the Louisiana division, Baltimore management required excess Louisiana profits to be sent to Maryland, where the funds were used as part of Ramsay Scarlett's working capital. Such a flow of money was present in *Xerox Corp. v. Comptroller, supra,* and a flow of funds (loans from the parent corporation) from outside the state into the taxing state was strongly relied on as showing the existence of a unitary business in *Earth Resources Co. of Alaska v. Dept. of Revenue, supra.* In *Russell Stover Candies, Inc. v. Dept. of Revenue, supra,* similar reliance was

placed on "home office" use of division profits in a manner much like that shown here.

The major recent Supreme Court decisions holding that businesses are not unitary are *ASARCO* and *Woolworth,* both *supra.* As our earlier discussion suggests, we read those cases as being factually distinguishable from the one now before us. That is true in large part with respect to the Pennsylvania cases upon which Ramsay Scarlett relies. In *Commonwealth v. ACF Industries, Inc.,* 441 Pa. 129, 271 A.2d 273 (1970) the Supreme Court found multiformity (*i.e.* a nonunitary business), but that was because the court saw the case as involving a single isolated investment that had no relationship to ACF's regular business. It held the gain realized upon the sale of that investment was not apportionable to Pennsylvania, where ACF did regular business. Aside from some factual difference, we regard the reasons in *Commonwealth v. Advance-Wilson Industries,* 456 Pa. 200, 317 A.2d 642 (1974) and *Logan Clay Products Co. v. Commonwealth,* 11 Pa.Cmwlth. 629, 315 A.2d 346 (1974) as not fully reflective of the more recent Supreme Court decisions in cases like *Container Corp., Exxon,* and *Mobil,* all *supra,* or of the opinion of our own Court of Appeals in *Xerox, supra.*

█ Factual comparisons, we add, are difficult to make in cases involving the unitary business concept. "The factual records in some cases . . . tend to be long and complex," *Container Corp., supra,* 103 S.Ct. at 2946, and there are always some factual similarities and some factual differences as between the cases. The question in each case is not whether any single factor would be constitutionally sufficient to establish the minimum contact or nexus necessary to support apportioned taxation of business income. Rather, it is whether all the factors taken in combination justify that result. *Id.,* 103 S.Ct. at 2948.

In the case at bar, when we fully and properly apply the pertinent standards to the facts, the answer to the legal question is apparent: the Tax Court's decision was not "within the realm of permissible judgment." *Container Corp., supra,* 103 S.Ct. at 2946. Whether Ramsay Scarlett

failed to sustain its burden of proof or whether the Comptroller succeeded in proving more than he had to, the Tax Court should have sustained the Comptroller's unitary business assertion. Because the Tax Court did not do that, the Circuit Court for Baltimore City, using the substitution of judgment standard of review we have earlier discussed, should have reversed. Invoking that standard of review, we do so now.[5]

JUDGMENT VACATED.

CASE REMANDED TO CIRCUIT COURT OF BALTIMORE CITY WITH DIRECTION TO REVERSE DECISION OF MARYLAND TAX COURT. COSTS TO BE PAID BY APPELLEE.

---

5.  Despite the unitary nature of the business involved in this case, and the consequent general unavailability of separate accounting to Ramsay Scarlett, it apparently would be open to the taxpayer to attempt to show that application to it of the statutory three-factor formula would be so arbitrary as to offend the relevant constitutional provisions. *Container Corp. of America v. Franchise Tax Board, supra,* 103 S.Ct. at 2940. *Cf. Hans Rees' Sons Inc. v. North Carolina,* 283 U.S. 123, 51 S.Ct. 385, 75 L.Ed. 879 (1931). But no issue as to the application of the statutory formula was raised, let alone decided, below, so far as we can tell from the record. Nor has Ramsay Scarlett briefed it on appeal. Therefore, it is not before us, Md.Rule 1085. *Health Services Cost Review Comm. v. Lutheran Hosp. of Maryland, Inc.,* 298 Md. 651, 472 A.2d 55 (1984).