# COMPTROLLER OF THE TREASURY, INCOME TAX DIVISION *v.* ATLANTIC SUPPLY COMPANY

[No. 169, September Term, 1981.]

*Decided August 11, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*John K. Barry, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General of Maryland,* and *Gerald Langbaum, Assistant Attorney General,* on the brief, for appellant.

*Ronald U. Shaw,* with whom were *John J. Ghingher, III* and *Weinberg & Green* on the brief, for appellee.

RODOWSKY, J., delivered the opinion of the Court.

This is an income tax case. The issue is whether all of the business income of the corporate taxpayer is to be allocated to Maryland because "the trade or business of the [taxpayer] is carried on wholly within this State . . . ." Md. Code (1957, 1980 Repl. Vol.), Art. 81, § 316 (c).[1] For the tax years in

---

1. Section 316 provides that "[t]he net income of a corporation (domestic or foreign) shall be allocated in the following manner." Special rules for the allocation of income from real estate and from tangible personal property, and for the allocation of capital gains and losses are set forth in subsections (a) and (b), which are not here involved. Subsection (c), dealing with business income, then provides:

(c) *Business income.* — The remaining net income, hereinafter referred to as business income, shall be allocated to this State if the trade or business of the corporation is carried on wholly within this State, but if the trade or business of the corporation is carried on partly within and partly without this State so much of the business income of the corporation as is derived from or reasonably attributable to the trade or business of the corporation carried on within this State, shall be allocated to this State and any balance of

issue, 1972-1976, the taxpayer reported its entire business income, apportioned part of it to Maryland, and paid taxes only on that portion it considered as taxable by Maryland. The Comptroller of the Treasury, Income Tax Division (Comptroller) assessed additional taxes, with interest, on the ground that no part of the income was derived from business conducted in any other state. This assessment was affirmed by the Maryland Tax Court. On appeal, the Baltimore City Court reversed the Maryland Tax Court and vacated the assessment of additional taxes. We granted certiorari on our own motion prior to consideration of the Comptroller's appeal by the Court of Special Appeals. For reasons hereinafter stated, the judgment of the Baltimore City Court will be affirmed.

Atlantic Supply Company (Atlantic) is the taxpayer. It is a wholly-owned subsidiary of The Macke Company (Macke-parent). Both Macke-parent and Atlantic are incorporated under the laws of the District of Columbia and each is qualified to do business in Maryland. The principal business office of Macke-parent is located in Cheverly, Maryland. Macke-parent has many subsidiaries in addition to Atlantic, the number of which fluctuated during the tax years involved. We shall call Macke-parent, and all of its subsidiaries, including Atlantic, simply "Macke." Macke is a "vendor, contract feeder." Part, if not all, of its business is

---

the business income shall be allocated outside this State. The portion of the business income derived from or reasonably attributable to the trade or business carried on within this State may be determined by a separate accounting where practicable, but never in the case of a unitary business; however, where separate accounting is neither allowable nor practicable the portion of the business income of the corporation allowable to this State shall be determined in accordance with a three-factor formula of property, payroll and sales, in which each factor shall be given equal weight and in which the property factor shall include rented as well as owned property and tangible personal property having a permanent situs within this State and used in the trade or business shall be included as well as real property. The Comptroller of the Treasury shall have the right, in those cases where circumstances warrant, to alter any of the above rules as to the use of the separate accounting method or the formula method, the weight to be given the various factors in the formula, the manner of valuation of rented property included in the property factor and the determination of the extent to which tangible personal property is permanently located within the State.

the retail sale of food and beverages through vending machines located on the commercial or industrial premises of others. Macke operates in 26 eastern states. In each trading area there is a Macke branch, with a warehouse. The record is unclear whether each branch location is operated through a separate subsidiary of Macke-parent, but we shall adopt the terminology of the parties and utilize the term "Macke-branch" as synonymous with one of the subsidiary corporations which sells to ultimate consumers.

Atlantic is not a Macke-branch. Indeed, Atlantic has no separate place of business, no payroll, no bank account and pays no dividends. Atlantic was incorporated in order to obtain a wholesale price on purchases from The Coca-Cola Company (Coca-Cola). Coca-Cola considers the Macke-branches to be retailers and therefore ineligible for wholesale pricing were they to purchase directly from Coca-Cola. After Atlantic was formed, the director of purchasing of Macke-parent has, apparently periodically, negotiated wholesale prices for sale by Coca-Cola of its products to Atlantic. Thus, while each Macke-branch places orders in its own name with other suppliers, orders throughout Macke for Coca-Cola products are made in the name of Atlantic.

Preliminary to Coca-Cola selling at wholesale, it requires an application to be submitted. It is Atlantic which in each case applied for Atlantic to be treated as a wholesaler by Coca-Cola. There are as many such applications as there are Macke-branches. The address for Atlantic on any such application by Atlantic is that of the Macke-branch involved. Atlantic states on each such application that the address so given is that of a branch of Atlantic, and that its home office is "P.O. Box 68, Hyattsville, Maryland 20781." Atlantic is identified on the application as a subsidiary of Macke-parent. The principal business office of Macke-parent at Cheverly is also in postal zone 20781.

Against this background, the procedure and accounting trail for the purchase of Coca-Cola products is as follows. An individual with purchasing responsibility at a

Macke-branch telephones his local source of Coca-Cola products and orally places an order. This is followed up by a written purchase order with the printed heading "the Macke Company." The form contains a blank for "ordered by" in which is inserted Atlantic's name and the address of the Macke-branch involved as Atlantic's local address. This is also the address to which Coca-Cola is directed to ship. On the purchase order Coca-Cola is directed to bill to Atlantic at the post office box in Hyattsville. Coca-Cola physically delivers, or arranges delivery, to the Macke-branch location. Coca-Cola mails its invoice to the post office box in Hyattsville, addressed to Atlantic in care of the Macke-branch involved. That invoice reflects that the order is shipped to Atlantic, care of the particular Macke-branch involved, at the branch address.

The Hyattsville post office box is simply that and no more. Atlantic has no office there, nor any office that is exclusively its own, at any location. Coca-Cola invoices are paid by the funds of Macke-parent from its office in Cheverly. (Atlantic has no bank account.) Physical processing in payment of the invoices from Coca-Cola to Atlantic is performed by employees on the payroll of Macke-parent. Payment of Coca-Cola's invoices to Atlantic is ordinarily done in time to take advantage of a 2% discount for prompt payment that is available from Coca-Cola. The amount advanced by Macke-parent in payment of Coca-Cola's invoices to Atlantic is inter-company invoiced by Macke-parent to Atlantic, so that Atlantic is charged by Macke-parent only to the extent of the discounted amount of the invoices, and not at their face amount. Employees paid by Macke-parent then prepare inter-company invoices by which Atlantic charges the particular Macke-branch involved with the face amount of the Coca-Cola invoice, even though the amount transmitted by Macke-parent, and owed by Atlantic to Macke-parent, is the discounted amount. This practice creates receivables of Atlantic from the Macke-branches (for Coca-Cola products sold by Atlantic to the Macke-branches) in excess of the cost of the goods to Atlantic (as represented by Atlantic's payables to Macke-parent). Therein lies one of the two types of income to Atlantic.

For the tax years here involved, the Macke-branches never made payment on their accounts payable to Atlantic and Atlantic never made payment on its accounts payable to Macke-parent. However, the Macke practice or policy was to charge interest on inter-company obligations at a rate representative of the cost of money to Macke-parent on the average outstanding net balance of inter-company obligations during a given fiscal year. The total amount of interest debited by Atlantic to the Macke-branches on the accumulated receivables held by Atlantic constitutes the second type of income to Atlantic that is involved in these proceedings.

The problem in the instant case is the legal result which flows from the foregoing facts. If Atlantic's business is carried on wholly in Maryland, its business income is not apportioned as Maryland and non-Maryland income, but rather Maryland taxes 100% of the income. If Atlantic's business is carried on partially in any other state, then Maryland taxes only so much of Atlantic's income as is apportionable to Maryland. In the latter event, we need not determine whether or not the apportionment actually made by Atlantic on its tax return was proper. The Baltimore City Court struck down the Comptroller's assessment of additional tax and did not disturb the amount of tax developed by Atlantic on its return. On this appeal the Comptroller does not contend that the apportionment calculation used by Atlantic was improper, but asserts only that Atlantic was not entitled to any apportionment whatsoever.

In its analysis, the Maryland Tax Court, in relevant part, concluded:

> When a Macke subsidiary . . . wishes to purchase Coca-Cola; *an order is placed by the subsidiary* with the Coca-Cola Company, which, in turn, invoices Atlantic Supply in Hyattsville, Maryland. The invoice is paid by Macke . . . . The Coca-Cola is then shipped to the Macke subsidiary not to Atlantic.
>
> Atlantic has no employees and no offices. Atlantic's dealings with Coca-Cola are handled by Macke employees in Cheverly, Maryland, including

the price for the Coca-Cola. *Atlantic cannot conduct any business until an order is placed by another Macke subsidiary.* Atlantic, when it does conduct business, engages only in book transactions. The Company has no bank accounts and does not distribute dividends.

. . . .

The Comptroller agrees that there is trade or business being carried on, but argues that it is not Atlantic who is performing this function.

The evidence introduced in this case supports the Comptroller's position . . . .

We note that while Atlantic and Macke are conducting a unitary business, separate filing is required by Section 295 of Article 81. [Emphasis added.]

The Baltimore City Court took a different approach. It reasoned that

[j]ust as Macke is able to allocate its income because it performs business partially within the state and partially without the state, I see Atlantic being in the same position. It is after all just a creature of law owing its entire existence to Macke and cannot in any sense be considered independent from Macke's operation.

In our view the legal characterization by the Tax Court of the transactions is not correct. Before articulating our reasons for this conclusion, an explanation should be given for the artificial mold in which the Maryland income tax law requires the analysis to be cast. Article 81, § 295 obligates "[e]very corporation . . . (domestic and foreign) having any income allocable to this State" to file a return and provides that "[c]orporations . . . which are affiliated shall each file separate returns." If Macke-parent, the Macke-branches and Atlantic could be, and were, required to file a consolidated return from which the consolidated business income would be apportioned between Maryland and other jurisdictions,

the microscopic examination of the legal niceties of Atlantic's operations as a specific corporate entity would be avoided.[2]

Once attention is focused specifically on Atlantic, it is apparent from the undisputed evidence that the trade or business of Atlantic is to purchase Coca-Cola products and sell them to the Macke-branches. Its business was to confer a benefit on Macke-parent and on the Macke-branches, as part of the unitary business. By means of Atlantic, the unitary business is supplied with Coca-Cola products at a lower price than that which could have been obtained by the Macke-branches, acting either independently or in concert. The testimony and documents demonstrate that the sales by Coca-Cola are made to Atlantic, and that it is Atlantic which sells to the Macke-branches. The fact that Atlantic is never physically in possession of an inventory of Coca-Cola products is not material. The course of doing business involved here is a series of sales contracts. Coca-Cola performs its contract of sale with Atlantic by delivery directly

2. The tax court's having found, as an ultimate fact, that "Atlantic and Macke [Macke-parent and the Macke-branches] are conducting a unitary business" did not alter the separate entity analysis. Other states, and most notably California, require the filing of a "combined report" in the case of multiple corporations, affiliated by common ownership, which conduct a unitary business. In essence, the information furnished is the combined net income of the unitary business which is first apportioned to the taxing state by formula and then, if necessary, a further apportionment is made of the amount so determined among the corporate entities which are doing business in the taxing state. *See* Keesling, A Current Look at the Combined Report and Uniformity in Allocation Practices, 42 J. Tax. 106 (1975); Edison California Stores, Inc. v. McColgan, 30 Cal. 2d 472, 183 P.2d 16 (1947); G. Altman and F. Keesling, *Allocation of Income in State Taxation* 166-69 (1946); Corrigan, Interstate Corporate Income Taxation — Recent Revolutions and a Modern Response, 29 Vand. L. Rev. 423, 439-41 (1976). *See generally* Hellerstein, Recent Developments in State Tax Apportionment and the Circumscription of Unitary Business, 21 Nat'l Tax J. 487 (1968); Keesling and Warren, The Unitary Concept in the Allocation of Income, 12 Hastings L.J. 42, 57-64 (1960); Rudolph, State Taxation of Interstate Business: The Unitary Business Concept and Affiliated Corporate Groups, 25 Tax. L. Rev. 171 (1969-1970).

This approach is illustrated in ASARCO, Inc, v. Idaho State Tax Commission, U.S. 102 S. Ct. 3103, 73 L. Ed. 2d 787 (1982), with respect to Idaho's pre-apportionment "unitized" treatment of the income of the taxpayer and its wholly-owned subsidiaries. That assessment, which was not at issue in the case, was made pursuant to a statute that permitted two or more corporations, the voting stock of which was more than 50% owned by a common owner, to be considered as a single corporation when necessary accurately to reflect income.

to the location of Atlantic's customer. And each time an order is placed by which Atlantic buys from Coca-Cola, there is also a contract of sale between Atlantic and its customer, the Macke-branch, which is performed by Atlantic's having caused Coca-Cola to deliver to the Macke-branch. When the Macke-branch and the Coca-Cola supplier are located in the same state, each of these simultaneous contracts are formed and performed in the state in which the particular Macke-branch is located. When purchase orders to Coca-Cola originate at the Macke-branch in Maryland, those contracts are formed and performed in Maryland. When purchase orders originate at a Macke-branch outside of Maryland, the simultaneous contracts are formed and performed outside of Maryland. Those simultaneous contracts were made regularly, and at relatively short intervals, because of the shelf life of the product.[3]

The Tax Court, in essence, rejected the foregoing analysis because Atlantic had no employees. That administrative body concluded that Atlantic could not act at the situs of any Macke-branch without having an employee there, and consequently attributed the purchases from Coca-Cola to the Macke-branches. That conclusion is unsupported by the evidence which came exclusively from witnesses and documents produced by Atlantic. It is contrary to the direct evidence to suggest that Coca-Cola and the Macke-branches intended to form sales contracts between themselves. Nor did the Tax Court make any finding that the documents evidencing sales contracts between Coca-Cola and Atlantic were created simply for the purpose of permitting Coca-Cola to say to its prospective retailer customers that there had been no deviation from its policy concerning eligibility for wholesale prices.[4] Moreover, Atlantic was not limited to

---

**3.** One exhibit, a letter from Coca-Cola to Atlantic at the Macke-parent office, suggests that stock should be replenished weekly.

**4.** In this connection, compare S. St. Ry. Advertising Co. v. Metropole Shoe Mfg. Co., 91 Md. 61, 46 A. 513 (1900) where the advertising company made an oral contract with an advertiser at a reduced rate. The parties then signed a written, spurious contract calling for a higher rate in order to prevent third parties from knowing that advertising space was being sold for less than the regular rate.

acting through full time, or paid, employees in order to enter into contracts as a buyer or as a seller. A corporation may act through authorized agents in making contracts. The persons who placed the orders with Coca-Cola, and who were employed at each Macke-branch by the Macke-branch, were authorized to contract for Atlantic with Coca-Cola, and for Atlantic and the Macke-branch, between themselves. With respect to the individual at any given Macke-branch who placed the Atlantic orders for Coca-Cola products, and thereby also effected a sale by Atlantic to the Macke-branch, the following statement from *Keitz v. National Paving and Contracting Co.,* 214 Md. 479, 491, 134 A.2d 296, 301 (1957) applies here:

> Can a servant have two masters, not joint employers, at one and the same time? This must be answered in the affirmative. A person may be the servant of two masters, not joint employers, at one time as to one act, provided that the service to one does not involve abandonment of the service to the other.

And *see Mackall v. Zayre Corp.,* 293 Md. 221, 229, 443 A.2d 98, 102 (1982); Restatement of Agency, Second, § 226.

The Comptroller, however, argues that Atlantic cannot be considered as conducting any part of its business outside of Maryland under the holding in *W.J. Dickey & Sons v. State Tax Commission,* 212 Md. 607, 131 A.2d 277 (1957). That case is readily distinguishable. It involved a Maryland based garment manufacturer whose sales were solicited, and orders obtained, by a New York based corporation. That selling agent submitted customer orders for approval, resulting in formation of a binding contract, to the New York based financial factor of the Maryland manufacturer. A contention by the manufacturer that it conducted part of its business in New York was rejected because the New York based corporations were independent contractors. Each was a distinct and separately owned, independent corporation which was not controlled by the Maryland manufacturer. Here we deal with a unitary business.

The provisions of present Article 81, § 316, which basically call for formulary apportionment of the business income of a unitary business, were enacted by Chapter 597 of the Acts of 1951 and became Code (1951), Art. 81, § 312 (b). This legislation had been recommended by the Maryland Tax Survey Commission of 1949 in its third interim report of December 14, 1950. *See* Report of the Maryland Tax Survey Commission of 1949 at *v*, 132, 154-57 (March 1949). The study commission concluded its discussion of the recommendation of formulary apportionment for unitary businesses with the following statement of underlying policy:

> Although it is constitutionally possible for the state of a corporation's legal domicile, that in which it is incorporated, to tax the entire net income of such corporation, and although there are indications in the decided cases that a state in which a corporation has acquired a commercial domicile by doing business therein may tax perhaps the entire net income of such corporation, the fair and realistic practice of the states is to tax only that portion of the corporate income attributable to sources within the particular state. The changes above advocated are recommended in the interest of promoting a system of taxation that will be at the same time equitable to the taxpayer and administratively feasible to the State. [*Id.* at 157.]

Thus, even if we assume that it would be constitutionally permissible for Maryland to allocate all of Atlantic's income to this State, § 316 is not intended to reach to the constitutional maximum in the case of a unitary business. Here, Atlantic's trade or business operates exclusively within Macke's unitary business. Even though Atlantic must file a separate tax return, the particular nature of its business cannot be ignored. Atlantic's business could not function without the funds supplied by Macke-parent and without the Macke-branches as captive customers. Within the framework of the kind of business it does, Atlantic enjoys the services of Macke-parent employees for Atlantic's cler-

ical and accounting functions and the services of Macke-branch employees as Atlantic's buying and selling agents. Those employees worked in Macke's unitary business, unlike the independent contractor corporations which were the agents in *Dickey.* It would not be consistent with the policy of apportioning the business income of a multi-state unitary business to extend the rule of *Dickey* to the facts of this case. Those individuals in the general employ of Macke-parent and of the Macke-branches, who conducted the business of Atlantic, were sufficiently related with Atlantic, through Macke's unitary business, to permit Atlantic to apportion its income.

The Tax Court erred by attributing Atlantic's business activity to other corporations within Macke while at the same time attributing the income to Atlantic. At least that part of Atlantic's income resulting from the difference between gross sales and the cost of goods sold was generated by means of Atlantic's agents in states other than Maryland. Accordingly, apportionment was required by § 316.

> *Judgment of the Baltimore. City Court affirmed.*
> *Costs to be paid by the Comptroller of the Treasury.*